831 So.2d 1116 (2002)
Aldrick MINOR
v.
STATE of Mississippi.
No. 2001-KA-01081-SCT.
Supreme Court of Mississippi.
December 5, 2002.
*1118 Pamela A. Ferrington, Natchez, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, attorneys for appellee.
Before PITTMAN, C.J., WALLER and GRAVES, JJ.
PITTMAN, C.J., for the Court.
¶ 1. Aldrick Minor was indicted for the murder of Anna Blank by a grand jury in the Circuit Court of Adams County. After a trial on the merits in the same court, the jury returned a guilty verdict against Minor. His motions for judgment notwithstanding the verdict and for a new trial were denied, and he was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Minor now appeals this conviction.

FACTS
¶ 2. Anna Blank identified Aldrick Minor as one of her main suppliers of narcotics to Adams County Sheriff's deputies working in the Metro Narcotics unit on January 5, 2001. Ten days later, another deputy responded to a report of a black car parked on the side of East Wilderness Road in the Broadmoor subdivision in Natchez, Mississippi. The car's engine was running, the headlights were on, andalthough it was a very cold morningthe driver's window was lowered completely. Blank was found in the driver's seat with two fatal gunshot wounds to the head and her mother's cellular telephone between her legs.[1] Inside the car were two spent .25 caliber bullet shells, unidentified hairs, and cigarettes.
¶ 3. The investigation into the cause of her death led Adams County deputies to a house just down the street, where a fish fry had been held the night before. Tiffany Houze and Daffney McDaniel hosted the party at their residence for a few of their friends, and the party continued into the early hours of the next morning. In attendance were Minor, Osman Perkins, Brian Williams, Jarrell Harris, Freddie Abraham, and Sharita Hawkins. Minor, Williams, Harris, and Abraham were playing cards.
¶ 4. Minor arrived later than the others, but was there when Abraham's cell phone rang at around 2:45 a.m. After a brief conversation, Abraham hung up and told those around him that it was the white girl calling and that he had told her to go somewhere away from Broadmoor to get rid of her. Later, his cell phone rang again. Blank had called to tell him that she had arrived at the designated location. Abraham hung up, but Minor instructed him to call Blank back and tell her to come to Broadmoor. This was done, and Blank called again when she arrived at Broadmoor.
¶ 5. After Blank's last call, Minor left the house. Approximately five to fifteen minutes later he returned, stating to the card players he had "4:30'd," or killed, Blank. He then moved a shiny gun from his back pocket to his front pocket. The card players, thinking he was not serious, continued to play cards. When Perkins left that morning around 3:45, he passed a car parked on the side of the road with its lights on and the engine running. Minor *1119 left the house on East Wilderness Road shortly after Perkins.
¶ 6. Later that day, Minor called McDaniel and told her to tell the investigating officers he was not at her residence that morning. Minor also told Abraham "only [me] and the good Lord knows where the gun was at." He also told another acquaintance that the police were trying to frame him for Blank's murder. He told the same acquaintance that when Blank arrived that evening he ran down the street past her, turned and fired twice, and ran back to the house on East Wilderness Road.[2]
¶ 7. The murder investigation then led the investigators to the house of Minor's stepfather where they intended to arrest Minor. There, they obtained consent to search the residence from the stepfather who told them Minor was in his room in the back. Minor was then arrested for Blank's murder. On the floor next to the bed where Minor lay sleeping was a black coat with sixteen unspent .25 caliber bullets in a pocket. The investigators seized this coat and the bullets as well as several pairs of black pants.

DISCUSSION

I. WHETHER THE EVIDENCE PRESENTED A TRIAL WAS INSUFFICIENT TO SUPPORT THE JURY'S VERDICT.
¶ 8. In this first issue on appeal, Minor argues that the evidence is insufficient to support the jury's guilty verdict. Specifically, he alleges that since (1) he provided a D.N.A. sample which did not match either the hair found in the car or saliva found on the cigarettes, (2) there was no blood found on the seized coat or pants which matched Blank's blood, and (3) there was no direct link between the bullets found in the coat pocket and the bullet shells found in the car, then there was no direct physical evidence that Minor had committed the murder. Furthermore, Kimberly Rawlings testified that she saw Blank's car moving slowly down East Wilderness Road after the time the State alleged that Blank was murdered, indicating that Minor did not kill Blank. The State responds that questions of witness credibility are to be resolved by the jury, and the previously described evidence supports the verdict.
¶9. The State's submission that this verdict is supported by circumstantial evidence overlooks the fact that direct evidence exists in the record to support Minor's conviction. Specifically, an admission of culpability by a defendant to a third party who is not a law enforcement officer constitutes direct evidence of a crime. Ladner v. State, 584 So.2d 743, 750 (Miss. 1991). We find Minor's statement to the card players that night shortly after the murder meets this criteria. Therefore, we shall employ the standard ordinarily used in cases where direct evidence was provided to the jury. This Court recently reiterated the standard it employs when considering a challenge of the sufficiency of the evidence:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidencenot just that supporting the case for the prosecutionin the light most consistent with the verdict. We give the prosecution the benefit of *1120 all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.
Turner v. State, 818 So.2d 1181, 1184 (Miss.2002) (quoting Smith v. State, 802 So.2d 82, 85 (Miss.2001)).
¶ 10. We conclude that this first issue is without merit. As summarized above, the evidence presented at trial, weighs greatly in favor of the jury's verdict. Minor told the witnesses playing cards at the fish fry that he "4:30'd," or killed, Anna Blank. He created the opportunity to kill her and was absent from the house at approximately the time she was shot. The bullets found in his coat pocket were of the same caliber and name brand as the shells found in Blank's car. The bullets removed from Blank's body were of the same caliber as the bullets found in Minor's possession. The coat was found in his room. He either hid or destroyed his gun, and he attempted to cover his tracks after the murder by coaxing friends to lie for him. He also had a motive to kill Blank. At the very least, reasonable and fairminded jurors, in the exercise of their judgment, could disagree whether these facts proved that Minor murdered Blank. Therefore, we find there is sufficient evidence to support the jury's verdict.

II. WHETHER THE COURT ERRED IN ADMITTING GRUESOME PHOTOGRAPHS OF THE VICTIM'S WOUNDS AFTER THE DEFENSE HAD STIPULATED THAT THE VICTIM HAD DIED OF GUNSHOT WOUNDS TO THE HEAD.
¶ 11. In this second issue on appeal, Minor alleges the trial court committed reversible error in admitting three color photographs of Anna Blank into evidence: two autopsy photos showing the entry wounds caused by the bullets which killed her, and one photograph taken of her at the scene on East Wilderness Road depicting the crime scene and how her body was oriented when it was discovered that morning.[3] Minor argues that since he stipulated that Blank died from two gunshot wounds to the head, the admitted pictures had no probative value or meaningful evidentiary purpose and only served to inflame the jury. The State responds that the pictures have probative value, and the trial judge did not abuse his discretion by admitting them.
¶ 12. The admission of evidence, including photographs, is left to the sound discretion of the trial judge. Noe v. State, 616 So.2d 298, 303 (Miss.1993). "A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose." Id. (citations omitted). This Court in Noe went on to state:
However, while a trial judge has a great deal of discretion in the admission of photographs, this discretion is not unfettered. *1121 Indiscriminate use of autopsy photographs depicting a corpse upon which a medical technician or pathologist has used the tools of his trade to puncture, sever, dissect, and otherwise traumatize body parts is ill-advised. Autopsy photographs are admissible only if they possess probative value.
Id. (citations omitted).
¶ 13. The three pictures in question mainly show Blank's head. The picture taken at the crime scene was taken from a distance of about two feet and shows Blank's body slumped to the back left side of the driver's seat with her head facing upward. There is a trail of blood visible on her forehead running up her head to her hairline and also around the side of her forehead, but the view of this trail is obstructed by the car door. Another small trail of blood is seen in her left ear. Blank is clothed, and the picture shows her body from approximately her waist upwards. We find this picture has probative value as evidence of the condition and orientation of the body when the sheriff's deputy first arrived on the scene as well as value in identifying Blank.
¶ 14. The other two photographs were taken in the morgue. Blank's body is unclothed, but the photos only show her head and shoulders. The blood from the wounds has been cleaned, and only a faint trace of blood is seen in one of the pictures which shows the inside of her left ear. The face-on picture of her head is probative because the blood is gone, and the location of the wound is visible. Its location is more visible from this picture than the one taken at the scene. The second picture shows where the other bullet entered the back left portion of her head. This cannot be seen in any other photograph admitted into evidence; therefore it had probative value to show the location of the other wound. We agree with the trial court's assessment that these autopsy photos have probative value and find that it was not error to admit them into evidence. Therefore, this issue is also without merit.

III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE BLACK JURORS IN VIOLATION OF BATSON v. KENTUCKY.

¶ 15. Next, Minor argues that the State used its first seven peremptory challenges to strike black jurors from the jury in violation of his constitutional right to equal protection.[4] He states that the reasons offered by the State to strike three jurors were not race-neutral. The State counters that the reasons were indeed race-neutral, and that no basis exists for disturbing the trial court's rulings.
¶ 16. This Court has recently restated the standard it employs when considering challenges under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986):
A reversal will only occur if the factual findings of the trial judge are "clearly erroneous or against the overwhelming weight of the evidence." "On appellate review, the trial court's determinations under Batson v. Kentucky are accorded great deference because they are based, in a large part, on credibility." The term "great deference" has been defined in the Batson context as meaning an insulation from appellate reversal of any trial findings which are not clearly erroneous.
Caston v. State, 823 So.2d 473, 498 (Miss. 2002) (citations omitted). The necessary steps to raise and address a Batson challenge were taken in this case. See id. *1122 The trial court made a determination that the State offered a race-neutral reason for each stricken juror. These reasons are examined below.
¶ 17. Prospective juror Celia Ann Jones Minor bears the same last name as the defendant. Minor states that the defendant having the same last name as a prospective juror is not a race-neutral reason for striking her. However, the State offered two more reasons to strike her: she was totally unresponsive to questioning and scowled at the prosecutor during voir dire. The trial court accepted these reasons as race-neutral, but found it particularly significant that the defendant and the prospective juror had the same last name. We conclude that these three reasons are indeed race-neutral; therefore, the trial court's decision to accept the strike should not be reversed.
¶ 18. Prospective juror Hazel Minor also shares the defendant's last name. She, unlike Celia Minor, stated to the trial court that she was not related to the defendant. She had also served on a jury previously and responded affirmatively when asked if she, a family member, or a close personal friend had ever been charged with a crime. In this instance, Minor argues that her responses that she could put aside her experiences and judge the defendant's guilt solely upon the evidence presented at trial should have satisfied any questions of her worthiness as a juror-making the State's strike pretextual. We disagree. The reasons offered by the State were race-neutral, and the trial court's decision to accept the strike is affirmed.
¶ 19. Finally, prospective juror Beverly Laurant knew a potential witness and responded affirmatively when asked whether she, a family member, or a close personal friend had ever been charged with a crime. When discussing these reasons the State offered to strike Laurant, the trial judge recalled a defendant named Laurant recently convicted before that court. Minor argues that these are not race-neutral reasons, and the trial court's reliance upon its recollection without substantive proof that the prospective juror and the convict were related was error. Again, we disagree. These reasons are race-neutral. Therefore, the trial court's decision to accept the strike is affirmed.
¶ 20. The State exercised seven peremptory challenges on the first panel it tendered to the defense. All seven of those strikes were exercised against black potential jurors. However, nine black potential jurors were on the panel, and the State accepted and tendered two of them with the first panel. We find that there is insufficient proof of purposeful discrimination against black potential jurors in the record. The State offered race-neutral reasons for exercising each of the strikes on the black potential jurors in question. Therefore, we conclude that the trial court did not commit error in accepting these reasons and allowing the State to exercise these strikes against the potential jurors.

IV. WHETHER THE TRIAL COURT ERRED IN DENYING MINOR'S MOTION FOR A NEW TRIAL BASED UPON IMPROPER COMMENTS MADE BY THE PROSECUTOR DURING CLOSING ARGUMENTS.
¶ 21. In this final issue on appeal, Minor complains that particular statements made by the State during its closing argument were improper because it was essentially name-calling and commenting upon the defendant's failure to testify. The State counters that Minor did not preserve this error by objecting at the time or attempting to have the statements stricken from the record and the jury instructed *1123 accordingly. Alternatively, the State argues that the statement does not comment on Minor's decision not to testify.
¶ 22. "It is the rule in this State that where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." Perry v. State, 637 So.2d 871, 874 (Miss.1994). Furthermore, "[f]or this Court to consider claims of alleged erroneous comments of the prosecuting attorney in closing arguments, a contemporaneous objection must have been made; otherwise, the point is deemed waived." Banks v. State, 782 So.2d 1237, 1242 (Miss.2001) (citing Handley v. State, 574 So.2d 671, 679 (Miss.1990)). The passage Minor cites as containing the error is quoted in full as follows:
Y'all have had a privilege today to listen to Mr. Colbert. Mr. Colbert is one of the better criminal defense lawyers in this part of the state. He does a good job. We fight him in many cases, and he fights hard every time, and he does a good job. But that's what it is, ladies and gentlemen. He told you himself. It's his job, and don't ever forget one thing. And that's the only thing he's got to do in here is convince you to let him go home. That's his job. He told you. I wrote it down when he said it. He says that he didn't thinkhe don't think our witnesses are telling you the truth. Well, the fact of the matter is, ladies and gentlemen, he don't care whether they tell you the truth or whether he believes them or not as long as he can convince you that you don't believe them. That's his job. Don't forget that.
[By defense counsel]: Your Honor, I'm going to object to Mr. Harper saying I don't care about the truth. I'm an officer of this court just as he is.
By the Court: I'll sustain about reference to counsel for the defendant. Let's proceed.
[By the State]: Don't forget that that's his job. And when good attorneys get in here, they basically do three or four things to try to do that, and the first thing they do, the first thing they do is to beat you over the head with reasonable doubt. Now, y'all heard Mr. Colbert's argument, and he does a good job, but I would have liked to have had the opportunity to count how many times he said reasonable doubt during the course of that argument. I submit to you it was in the hundreds. He beat you over the head with it to intimidate you with it to make you think that you can't do it. That you don't have enough common sense to listen to what's going on in here. I submit to you that you do, ladies and gentlemen, and you know what happened in this case. And the second thing they do, and they ain't got any choice. They're going to attack our witnesses. What else they going to do. If you believe our witnesses, he's sunk. So what are they going to do? You can't believe our witnesses. Talk about how terribleladies and gentlemen, we never held back anything.
¶ 23. After reviewing this passage we agree with the State that this argument is procedurally barred. Minor did not object to the language he submits is inappropriate comment on his decision not to testify when the State was making its rebuttal closing argument. Therefore, the issue is not preserved for appeal. We find the substance of this argument is not out-of-bounds for closing arguments; so there is no plain error to be found here either. Furthermore, with regard to the name-calling, the trial court sustained the objection to the perceived fault. The failure to instruct the jury to disregard the objectionable comments rests with Minor *1124 who failed to move the trial court for such instruction. Therefore, this issue is also without merit.

CONCLUSION
¶ 24. For the above stated reasons, we conclude that the trial court did not err in this case and should be affirmed in all respects. There was legally sufficient evidence to support the verdict, the pictures admitted into evidence were not unduly prejudicial, there is insufficient proof of discrimination by the State against black members of the venire to find a Batson error, and Minor's arguments about the State's comments during rebuttal closing argument are procedurally barred. Therefore, the trial court's judgment is affirmed.
¶ 25. CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAYMENT OF ALL COURT COST AND FEES, AFFIRMED.
McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.
NOTES
[1] Blank was not operating as a confidential informant for Adams County the night that she was killed.
[2] This witness made these statements to the Sheriff's deputies in a statement, but recanted during his testimony at trial.
[3] The trial judge excluded as redundant a second picture of Blank's body at the scene of the crime taken at a closer angle on a motion in limine to exclude these pictures.
[4] Minor is a black male. Blank was a white female.