ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. On March 27, 2003, Willie Barnes was murdered while working at his barbershop in Jackson, Mississippi. Richard Mitchell was subsequently arrested for the crime. During his trial, the testimony revealed that: (1) Mitchell needed money to pay his probation fees; (2) he planned to rob Barnes to get the money; (3) he pos
 
 *635
 
 sessed the pistol that was later identified as the murder weapon; (4) he was seen heading in the direction of the barbershop prior to the murder; (5) he had blood on his shirt when he returned; and (6) he admitted that he had robbed someone. The jury found him guilty of capital murder, and he was sentenced to life without the possibility of parole in the custody of the Mississippi Department of Corrections.
 

 ¶ 2. Mitchell filed a motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial; however, the trial court denied his motion. Mitchell now appeals and argues that: (1) the trial court erred in refusing two defense instructions; (2) the jury’s verdict was against the weight and sufficiency of the evidence; and (3) the State made improper comments during closing argument.
 

 ¶ 3. Finding no error, we affirm.
 

 FACTS
 

 ¶ 4. Officer Slade Moore with the Jackson Police Department (JPD) testified that on March 27, 2003, at approximately 6:00 p.m., he was traveling north on Dr. Martin Luther King, Jr. Drive and saw an individual run across Dr. Martin Luther King, Jr. Drive in the area around the Deluxe Barbershop. Once he was in front of the barbershop, he was flagged down and told that someone had been shot in the barbershop. When he entered the barbershop, he discovered the body of Barnes and secured the crime scene.
 

 ¶ 5. Cleotha Warren testified that at the time of the murder, he lived on Crawford Street, which is west of Dr. Martin Luther King, Jr. Drive. He stated that he saw a man, who was acting nervous and excited, take a pathway between two houses on Crawford Street. Warren stated that fifteen or twenty minutes later he saw the same man return and walk behind the barbershop. Warren identified Mitchell in a photo lineup as the man he saw that day. However, he could not identify Mitchell in court.
 

 ¶ 6. Darwin Traylor, one of the State’s main witnesses, testified that he lived at 829 Powell Rhodes Drive, which is next door to Robert Buford. According to Traylor, prior to the murder, Mitchell stated that he was concerned that he would not have the money he needed to pay his probation officer. Later that day, he saw Buford and Mitchell leaving an apartment, and Mitchell had a gun. The pair went down a path that led to Crawford Street, which is one block north of Powell Rhodes Drive. Buford returned first, followed by Mitchell shortly thereafter. Once Mitchell returned, he ran to the pathway beside Traylor’s house and called to Buford, who was further down the street. Traylor testified that Buford went over to Mitchell, and as Buford and Mitchell were walking, Mitchell dropped what could have been a wallet. Once the pair arrived behind Buford’s house, Mitchell asked Buford for a shirt because his was covered in blood. Traylor testified that Buford complied and gave Mitchell a black shirt with an orange and gray stripe, although he could not identify the shirt at trial. According to Traylor, Mitchell put the bloody shirt in a bag and threw it in the garbage. Traylor testified that he neither saw an exchange of money between Buford and Mitchell, nor heard any conversation about money.
 

 ¶ 7. On cross-examination, defense counsel brought to light some inconsistencies between Traylor’s testimony and a statement he gave to the police. According to his statement after the murder, Traylor saw Mitchell pull money out of his pocket, not a wallet. Additionally, in his statement to police he told them that he saw Buford with the gun, not Mitchell. Finally, he also told the police that he did not see Mitchell throw away his shirt and did
 
 *636
 
 not see him with a gun. However, Traylor stated that he made the statement to the police when he was fourteen years old, and at the time, he was scared. He stated that his testimony at trial was a more accurate recollection of what he witnessed.
 

 ¶ 8. Buford, who was fifteen at the time of the murder, was the next person to testify for the State. Similar to Traylor, Buford stated that sometime prior to the murder, Mitchell was concerned about a fee he owed to his probation officer. He told Buford that he was going to “hit a lick” in order to obtain enough money to pay the fee.
 
 [1]
 
 He stated that he was returning from the Mary C. Jones Community Center on Dr. Martin Luther King, Jr. Drive with his cousin, Michael Deshaun Gibson, around 6:00 p.m. on the day of the murder. Buford testified that he saw Mitchell running out of a pathway behind Buford’s house, and Mitchell called him over. Buford did as directed and saw that Mitchell had a 9mm pistol in his pocket. Buford said Mitchell seemed frustrated and scared, and he asked Buford for a new shirt because his had blood on it. Buford gave him a “gray, orange [shirt] with stripes” in exchange for ten dollars, and Buford testified Mitchell put it on over his bloody shirt. At trial, Buford identified a shirt that was retrieved from Mitchell’s house as the shirt he gave Mitchell. During trial, Buford testified that Mitchell did not say anything about the gun or the blood on his shirt. However, at the time of the murder, Buford gave a statement to the police in which he stated that he asked Mitchell how he got the blood on his shirt, and he responded that he had just shot someone.
 

 ¶ 9. During cross-examination, Buford stated that he pled guilty to accessory after the fact to the murder and was sentenced to three years’ imprisonment. As part of his plea bargain, Buford agreed to testify against Mitchell. However, he made it clear that he was not present when the victim was shot, and did not know who did it.
 

 ¶ 10. Gibson testified that at the time of trial he was serving a four-year term of incarceration in connection with his plea of guilty to accessory after the fact to the murder. He testified that sometime in March 2003, Mitchell told him he was being assaulted by other individuals in the neighborhood. In response, Gibson gave Mitchell a 9mm pistol so that he could defend himself. As was the case with Traylor and Buford, Mitchell also told Gibson he was having trouble paying his probation officer. Mitchell told him that he had some money, but that if he could not get more money soon, he was going to “hit the barbershop man up.” Gibson testified that he saw Mitchell again on March 27, 2003, walking on a pathway on Crawford Street wearing a bloody white t-shirt and blue jeans. Mitchell told him he “hit a lick,” but did not give anymore details. Gibson told Mitchell that he wanted a “piece of the lick” because Mitchell used his gun, and Mitchell gave Gibson ten dollars. During trial, Gibson was asked if he could identify the pistol that was found during the investigation and matched to the projectiles discovered at the scene of the murder. He stated, “I think that’s it, ma’am.... I think so, yes, ma’am. 9mm. It’s a Beretta, ain’t it?.... Yes, ma’am, it look [sic] like it.”
 

 ¶ 11. Investigator Charles Taylor, a crime scene investigator with the JPD, testified that during his survey of the
 
 *637
 
 crime scene, he found, among other items, three spent 9mm cartridges and two projectiles. He also discovered that the victim had a revolver in his pocket. Additionally, two shoe impressions were made from foot prints found in the backyard of a Crawford Street home. During his investigation, Taylor tested the 9mm pistol, which was later discovered, for fingerprints. He was able to lift one print from the pistol’s magazine; he delivered the print to the district attorney’s office, but did not discover any fingerprints on the pistol itself.
 

 ¶ 12. Detective James Cornelius with the JPD testified that during the early stages of his investigation, he was told that Gibson and Buford may have information pertaining to the murder, and he interviewed both men the day after the murder. Mitchell surfaced as a suspect as a result of those interviews. An arrest warrant was issued for Mitchell, and a search warrant was issued for his residence. Detective Cornelius executed the search warrant and found three pairs of tennis shoes, a white T-shirt, and a gray shirt with blue and orange stripes in Mitchell’s room. No firearm was found during this search. However, several days later Katherine Ledbetter, who is Buford’s aunt and Gibson’s grandmother, contacted investigators and told them that she found the 9mm pistol in a wooded area behind her house. Ledbetter testified that the police did not search the area in which she found the pistol. She testified that she took it upon herself to search for the weapon, and she specifically testified that Buford did not tell her where it was. The clothing found at Mitchell’s house was later tested for blood; however, none was found. Additionally, the projectiles found at the crime scene were tested, and it was determined that they were fired from the 9mm pistol found by Ledbetter. Detective Cornelius was later recalled by the defense. He testified that at the time Ledbetter notified the JPD that she found the pistol, she told him Buford told her where the gun was.
 

 ¶ 13. No fingerprints were found on the pistol itself; however, Melvin Jones, a criminologist with the JPD, testified that a fingerprint was found on the pistol’s magazine. He testified that he was asked to check the print only against Mitchell. He stated that the fingerprint on the magazine did not match Mitchell’s.
 

 ¶ 14. As to the victim’s cause of death, Dr. Stephen Hayne performed the autopsy and discovered that the victim was shot three times, two of which were fatal. Dr. Hayne testified that in addition to the three gunshot wounds, the victim also had several non-lethal abrasions. Specifically, the victim had an abrasion on his upper left back, on his left knee, and two larger cuts on the right side of his forehead.
 

 PROCEDURAL HISTORY
 

 ¶ 15. Mitchell was indicted for murdering Barnes while in the commission of a robbery. Following his October 2006 trial in the Circuit Court of Hinds County, Mitchell was found guilty by a jury of his peers and sentenced to life in the custody of the Mississippi Department of Corrections without the possibility of parole. After the trial court denied his motions requesting a JNOV or a new trial, Mitchell timely appealed his conviction to this Court.
 

 ANALYSIS
 

 I. WHETHER THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTIONS D-10 AND D-ll.
 

 ¶ 16. At the conclusion of Mitchell’s trial, the trial court conducted a hearing on the proposed jury instructions from
 
 *638
 
 the State and Mitchell. Over the objections of Mitchell’s trial counsel, the trial court granted the State’s instructions S-3 and S-4, which covered the issue of accomplice testimony. Additionally, the trial court denied defense instructions D-10 and D-ll, which covered the same topic, stating that instructions S-3 and S-4 sufficiently instructed the jury on accomplice testimony. Mitchell argues that the trial court erroneously refused instruction D-10 and D-ll and deprived him of his right to a properly instructed jury.
 

 ¶ 17. Our standard of review when faced with a trial court’s denial of a proposed jury instruction is clear. The supreme court has stated that:
 

 The Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. A defendant is entitled to have jury instructions given which present his theory of the case. This entitlement is limited, however, in that the [Cjourt is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
 

 Spicer v. State,
 
 921 So.2d 292, 313(¶43) (Miss.2006). Mitchell claims that the evidence presented against him at trial warranted “stronger words of caution” against the testimony of an accomplice than those that were included in the State’s instruction. In support of his position, Mitchell cites
 
 Wheeler v. State,
 
 560 So.2d 171 (Miss. 1990). However,
 
 Wheeler
 
 does not help Mitchell’s cause.
 

 ¶ 18. In
 
 Wheeler,
 
 Wheeler argued that the trial court erred in refusing to grant defense instruction D-2, which stated:
 

 The Court instructs the Jury that the law looks
 
 with suspicion
 
 and distrust on the testimony of an alleged accomplice, and requires the jury to weigh same
 
 with great care and caution and suspicion.
 
 You should weigh the testimony from alleged accomplices, and passing on what weight, if any, you should give the testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.
 

 Id.
 
 at 172 (emphasis added). The jury was alternatively instructed as follows: “Neal Woodard and Franklin Holmes are accomplices in this case, and the testimony of an accomplice is to be considered and weighed with
 
 great care and caution.
 
 You may give it such weight and credit as to which you deem it to be entitled.”
 
 Id.
 
 (emphasis added). The supreme court found that the trial court erred “in deleting the requirement to view accomplices’ testimony with suspicion” and held that the facts of the “case warranted a stronger warning to the jury” than that expressed in the instruction given.
 
 Id.
 
 at 174. Such is not the situation we face in the present case.
 

 ¶ 19. State instruction S-3 stated as follows:
 

 The Court instructs the jury that Michael Gipson [sic] is an accomplice in this case and the uncorroborated testimony of an accomplice is to be considered and weighed
 
 with great care[] caution!J and suspicion.
 
 You may give it such weight and credit as you deem it is entitled.
 

 (Emphasis added). State instruction S^l mirrored S-3, but it replaced “Michael Gibson” with “Robert Buford.” Defense instruction D-10 read as follows:
 

 The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged participant and requires the jury to weigh same with great care and suspicion. You should weigh the testimony of Robert Buford and Michael Gibson and passing
 
 *639
 
 on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.
 

 Defense instruction D-ll stated:
 

 The Court instructs the jury that witnesses, Robert Buford and Michael Gibson, were convicted of [ajccessory after the [fjact in this case. You should weigh these witnesses’ testimony with great care, caution, and suspicion. You must consider the extent the witnesses!”] testimony is either supported or contradicted by other evidence[,][t]he relationship the witnesses may have with either side and to each other[,] and how the witnesses might be affected by the verdict.
 

 In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or deliberate falsehood, and whether [it] pertains to a matter of importance or [is an] unimportant detail.
 

 You may reject or accept all or any part of the witness’s testimony and you may reject part and accept other parts of the witness’s testimony.
 

 After making your own judgment, you will give the testimony of each witness the weight and credibility, if any, as you may think it deserve[s].
 

 ¶20. It is clear that instructions S-3 and S-4 contained the necessary language instructing the jury to view the uncorroborated testimony of an accomplice with “great care, caution, and suspicion,” thus satisfying the requirements of
 
 Wheeler. See Smith v. State,
 
 907 So.2d 292, 297(¶ 27) (Miss.2005) (holding that
 
 Wheeler
 
 stands for the proposition that the term “suspicion” must be included in an accomplice instruction). Furthermore, proposed instruction D-10 was a misstatement of the law as it implied that the testimony of an accomplice should
 
 always
 
 be viewed with great caution and suspicion. A jury should only view that portion of an accomplice’s testimony that is uncorroborated under such a mistrustful lens.
 
 Smith,
 
 907 So.2d at 298(1128). Therefore, we find that the trial court did not err in refusing proposed instructions D-10 or D-ll, as D-10 was an incorrect statement of the law and the previously accepted instruction S-3 and S-4 accurately instructed the jury on accomplice testimony. This issue is without merit.
 

 II. WHETHER THE TRIAL COURT ERRED IN DENYING MITCHELL’S MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, A NEW TRIAL.
 

 ¶ 21. It is unclear from Mitchell’s brief whether he raises the issue of weight of the evidence or sufficiency of the evidence as he combines indications of both arguments within his second issue. Because these issues are distinct and must be viewed under differing standards of review, we will address each separately.
 

 A. Sufficiency of the evidence.
 

 ¶ 22. The standard of review we must employ for sufficiency of the evidence has been stated often as follows:
 

 A motion for a directed verdict and a motion for a judgment notwithstanding the verdict challenge the sufficiency of the evidence. When reviewing a case for sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence must show beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that
 
 *640
 
 every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. If, keeping in mind the reasonable-doubt standard, reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient.
 

 Boone v. State,
 
 973 So.2d 237, 242(¶ 18) (Miss.2008) (internal citations and quotations omitted) (quoting
 
 Brown, v. State,
 
 970 So.2d 710, 712-13(¶ 7) (Miss.2007)).
 

 ¶ 23. Mitchell was convicted of capital murder in violation of Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2006), which makes it a crime to kill a “human being without the authority of law by any means or in any manner ... (e) [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of ... robbery ... or in any attempt to commit such [felony][.]” The underlying crime in Mitchell’s case was robbery. In order to prove robbery the State was required to demonstrate the following elements: “(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property of another from his person or in his presence.”
 
 Walker v. State,
 
 913 So.2d 198, 223(¶ 78) (Miss.2005) (citation omitted).
 

 ¶ 24. Mitchell argues that the evidence against him was not sufficient to warrant a guilty verdict as a result of the numerous inconsistencies of the State’s witnesses’ testimony and lack of investigation by law enforcement. While the evidence against Mitchell was certainly not overwhelming, we find that there was sufficient evidence to establish Mitchell’s guilt. There was undisputed testimony from several witnesses that Mitchell needed money in order to pay his probation officer. Additionally, Gibson testified that Mitchell told him that if he did not get the money he needed he was going to “hit the barbershop man up.” Gibson also stated that the day of the murder he saw Mitchell in a bloody shirt, and Mitchell told him that he had just “hit a lick.” Buford also testified that Mitchell told him he was going to “hit a lick” in order to come up with the money needed to pay his probation officer. Further, Gibson testified that he gave Mitchell the pistol used in the commission of the murder. Additionally, although Warren could not identify Mitchell during the 2006 trial, he did identify Mitchell in 2003 from a photo lineup as the individual he saw go behind the barbershop shortly before the victim’s body was discovered.
 

 ¶ 25. Traylor testified that he saw Mitchell walking toward a pathway that led in the direction of the barbershop with a gun prior to the murder. Additionally, Traylor stated that when Mitchell returned he saw him drop what looked like a wallet. Further, Traylor testified that Mitchell’s shirt was bloody, and he overheard Mitchell ask Buford for another shirt. Finally, Buford testified that Mitchell asked him for a shirt because his was covered in blood, and he identified the shirt retrieved from Mitchell’s room as the shirt he gave him.
 

 ¶ 26. It is clear that there were inconsistencies between the live testimony of the witnesses, as well as particular witnesses’ testimonies at trial and statements they gave to the police. However, it has been consistently held that “when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony.”
 
 Ford v. State,
 
 975 So.2d 859, 869(¶ 36) (Miss.2008) (quoting
 
 Gathright v. State,
 
 380 So.2d 1276, 1278 (Miss.1980)). Unfortunately for Mitchell, the jury
 
 *641
 
 weighed the evidence presented at trial against him and returned a verdict of guilty. Viewing the evidence in the light most favorable to the prosecution, we find that the evidence was not such that reasonable jurors could have only returned a verdict of not guilty. Therefore, we find that this issue is without merit.
 

 B. Weight of the evidence.
 

 ¶ 27. We have stated the standard of review when determining if a verdict is supported by the weight of the evidence as follows:
 

 The appellate court must accept as true all evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. The State is given the benefit of all favorable inferences that may reasonably be drawn from the evidence. The appellate court should not reverse a guilty verdict unless failure to do so would sanction an unconscionable injustice. This Court does not have the task of re-weighing the facts in each ease to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible.
 

 Hodges v. State,
 
 906 So.2d 23, 26(¶ 11) (Miss.Ct.App.2004) (internal citations and quotations omitted).
 

 ¶ 28. Accepting all the evidence detailed above as true, and giving the State the benefit of all favorable inferences, we cannot say the trial court erred in failing to grant Mitchell a new trial. Accordingly, this issue is without merit.
 

 III. WHETHER THE STATE’S CLOSING ARGUMENT WAS IMPROPER.
 

 ¶ 29. During its closing arguments, the State made several references to the testimony of its witnesses. Specifically, throughout the State’s closing argument the following statements were made:
 

 ... none of [Gibson’s] testimony was disputed. There were no questions asked. So everything that Michael Gibson says has to be taken as truth by the jury.
 

 [[Image here]]
 

 So Michael Gibson who is a street kid, you know, you used my gun. You got a lick off my piece. He wants a piece of the blood money, so he takes ten dollars. Uncontested testimony.
 

 [[Image here]]
 

 [Gibson] admitted to [taking the ten dollars from Mitchell]. He admitted that’s what Richard Mitchell did and what he told him. Uncontested testimony.
 

 [[Image here]]
 

 Darwin Traylor could not recognize the shirt but we have two witnesses who do recognize the shirt. Obviously, Richard Mitchell was given a shirt to wear over his bloody t-shirt. Corroborated testimony by two witnesses. Uncontested testimony from Michael Gibson. It has to be taken as truth.
 

 [[Image here]]
 

 Once again, just to reiterate, Michael Gibson’s testimony is unrefuted.
 

 ¶ 30. For the first time on appeal, Mitchell argues that the State’s comments were improper and requests this Court reverse his conviction based upon the doctrine of plain error. Specifically, Mitchell argues that the State impermissibly commented on his right not to testify and attempted to instruct the jury on how to weigh certain evidence. The State counters that Mitchell waived his right to raise this issue when he failed to voice an objection to the State’s comments during its closing argument. Alternatively, the State contends that if this Court reaches the
 
 *642
 
 merits of Mitchell’s claim, we should, nonetheless, affirm Mitchell’s conviction as the closing argument merely highlighted Mitchell’s lack of a defense and did not comment on his failure to testify.
 

 ¶31. Typically, the failure to voice a contemporaneous objection to the State’s closing argument constitutes a procedural bar to raising the issue on appeal.
 
 Dam,pier v. State,
 
 973 So.2d 221, 236(¶ 40) (Miss.2008) (citing
 
 Ross v. State,
 
 954 So.2d 968, 1001(¶71) (Miss.2007)). However, if the statement is found to violate the defendant’s constitutional rights, no waiver of the defendant’s right to raise the issue will be found, and the defendant may do so for the first time on appeal under the doctrine of plain error.
 
 Id.
 
 As applied to closing arguments, plain error may only be found “when the substance of the statement is ‘out of bounds for closing arguments.’ ”
 
 Boyd v. State,
 
 977 So.2d 329, 337(¶ 34) (Miss.2008) (quoting
 
 Minor v. State,
 
 831 So.2d 1116, 1123(¶ 23) (Miss.2002)). Notwithstanding the possible procedural bar in the instant case, we note that the supreme court has alluded to what is “out of bounds” as follows:
 

 Attorneys are alloiued a wide latitude in arguing their cases to the jury. However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.
 
 The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is
 
 whether the natural and probable effect of the improper argument is to create unjust prejudice axjainst the accused so as to result in a decision influenced by the prejudice so created.
 

 Dampier,
 
 973 So.2d at 235(¶ 39) (internal citations omitted) quoting
 
 Sheppard v. State,
 
 777 So.2d 659, 661(¶ 7) (Miss.2000).
 

 ¶ 32. In order to overcome the procedural bar, Mitchell must demonstrate that a constitutional right was violated as a result of the State’s comments. It is a criminal defendant’s constitutional right to choose whether to take the witness stand in his own defense. U.S. Const, amend. V; Miss. Const., Art. 3, § 26. Consequently, “any reference to the defendant’s failure to testify implying that such failure is improper, or that it indicates the defendant’s guilt” is prohibited.
 
 Wright v. State,
 
 958 So.2d 158, 161(¶ 8) (Miss.2007). However, there is a difference between a comment on a defendant’s choice not to testify in his own defense and a comment on the lack of a credible defense.
 
 Id.
 
 at 164(¶ 14). Therefore, “[w]hen the statement is not an outright violation, [the appellate court] will review the facts on a case-by-case basis.”
 
 Id.
 
 at 166(¶ 24).
 

 ¶ 33. The facts of the instant ease are similar to those in
 
 Dora v. State.
 
 In
 
 Dora,
 
 the State made the following comment during its rebuttal closing argument:
 

 You also heard the fact that it is undisputed, ladies and gentlemen, that this defendant^ Terry Dora,] told Rebecca Dora, I will give you $5,000; I’m sorry I got you into this trouble, but I will give you $5,000 to go in there and take the rap for me. That is also undisputed. Nobody came forward and said that didn’t happen. I submit to you, [l]adies and [gjentlemen, that is strong evidence that—
 

 Dora v. State,
 
 986 So.2d 965, 970(¶ 10) (Miss.Ct.App.2007),
 
 rev’d,
 
 986 So.2d 917 (Miss.2008). At the time of the alleged statement, Dora, Rebecca, and Rebecca’s daughter were the only individuals present, and both Rebecca and her daughter testified that Dora made the statement.
 
 Dora,
 
 986 So.2d at 970(¶ 11).
 

 Additionally, the prosecutor commented that two other pieces of evidence were
 
 *643
 
 “undisputed.” First, he claimed it was undisputed that Dora placed the cocaine in the trash can. As Dora, Rebecca[,] and her daughter were the only occupants in the house at the time, he was the only one who could have said differently. Second, the prosecutor told the jury that Officer Lewis’s testimony that Dora was exiting the bathroom was undisputed. As Dora and [Officer] Lewis were the only people present at the time, Dora was the only person who could have come forward and denied it.
 

 Id.
 
 at (¶ 12).
 

 ¶ 34. In reversing this Court’s holding that the State’s comments were impermissible, the supreme court stated that considering the State’s comments made during closing argument “in context with Dora’s theory of the case, this Court finds that the prosecutor’s statement was a permissible comment on the absence of evidence to support Dora’s defense. The prosecutor’s statement neither referred to Dora’s failure to testify, nor by masked implication suggested Dora’s silence was evidence of guilt.”
 
 [2]
 

 Dora,
 
 986 So.2d at 923(¶ 13). In the instant case, the defense’s theory of the case was never so explicitly stated as in
 
 Dora;
 
 however, it is clear from the transcript of the trial as a whole that the defense’s theory of the case was that Mitchell was innocent and Buford was the guilty party.
 
 [3]
 
 As in
 
 Dora,
 
 the State’s comments during its closing argument brought attention to the lack of evidence supporting Mitchell’s theory of the case. Accordingly, we are unable to find that the statements made in the State’s closing argument created a prejudicial effect, were “out of bounds,” or that they violated Mitchell’s constitutional right against compulsory self-incrimination. Thus, we find this issue does not rise to the level of plain error and is without merit.
 

 ¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ, CONCUR.
 

 [1]
 

 . Buford testified that “hitting a lick” meant to rob someone or otherwise get money "the easy way.”
 

 [2]
 

 . The footnote accompanying the preceding quote stated that "[i]n closing argument, counsel for Dora stated 'our theory of the case ... is that [Rebecca] stood to go to prison, and that they did not want to see Rebecca go to prison. So they put it on my innocent client, [Dora], who has the presumption of innocence before you, the jury.' "
 
 Dora,
 
 986 So.2d at 923 n. 12.
 

 [3]
 

 . Examples of instances during the trial indicating Mitchell's theory of the case include the following: (1) when defense counsel was cross-examining Traylor, she highlighted the fact that Traylor initially told police that he saw Buford with the gun; (2) when referring to the fact that Buford and Ledbetter went to view the barbershop while police were investigating the scene, defense counsel asked Buford during cross-examination whether he had heard of the saying that "the guilty party always returns to the scene of the crime”; (3) defense counsel asked Buford during cross-examination whether he knew that Mitchell implicated him as the guilty party in Mitchell's statement to the police; (4) defense counsel asked Buford during cross-examination whether he ever had the murder weapon in his hand; and (5) during the defense's casein-chief, defense counsel asked Detective Cornelius if Ledbetter had told him that Buford told her where the murder weapon was.