# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00038-SCT

*BRANDON JAKE SPIERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/01/2021 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| TRIAL COURT ATTORNEYS: | REBECCA PRUETT DENHAM |
| | JAMES LEWIS LANE, JR. |
| | ALEXANDER IGNATIEV |
| | LAURA KE'YUANA COOPER |
| | ANDREW JAMES WILLIAMS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/18/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. Brandon Spiers was arrested on charges of burglary of a dwelling and attempted sexual battery. His trial began on November 11, 2021. He was convicted on both charges. Spiers was sentenced to serve twenty-five years under the supervision of the Mississippi Department of Corrections (MDOC) for the burglary-of-a-dwelling conviction, and he was sentenced to thirty years under the supervision of MDOC for the attempted sexual battery

conviction. The sentence for attempted sexual battery was ordered to run consecutively with the burglary-of-a-dwelling sentence. Spiers appeals to this Court and argues: (1) the trial court erred by granting a jury instruction requiring Spiers to prove the affirmative defense of consent by clear and convincing evidence; and (2) the State engaged in prosecutorial misconduct during its closing argument. Upon review of the record, this Court affirms Spiers's convictions.

**FACTS**

¶2. In the early morning hours of September 10, 2019, law enforcement responded to reports of a man in a neighborhood acting suspiciously. When they arrived in the neighborhood, they saw Spiers outside of Connie Montgomery's home. Officers also noticed MM[1] and Montgomery standing on their front porch. MM and Montgomery told law enforcement that Spiers had come into their home and threatened to shoot MM if MM did not perform oral sex on him. Based on that information, law enforcement arrested Spiers for burglary of a dwelling and attempted sexual battery. Spiers waived his *Miranda*[2] rights and provided a statement to law enforcement. In his statement to law enforcement, Spiers stated:

> I left Walmart going to my friend's house . . . . When I got there they were asleep so I walked around the corner to Katie's which I met a few times. Katie opened the door. I asked if I can use a phone or sleep on the couch so I can get out the streets. She told me to come on when she got to her room she went to give me the phone and when I was about to make a call she started screaming

---

[1] MM's initials are used to protect her identity.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

he has a [sic] gun.  I told her to calm down I have no gun and her grandmother came in and asked if I would leave.  I said yes ma'am and walked out.[3]

On September 8, 2020, a grand jury indicted Spiers for burglary of a dwelling and attempted sexual battery.

¶3.     Spiers's trial began on November 10, 2021.  The State's first witness was Officer Tammy Shelbourn.  Officer Shelbourn was a patrol officer with the Hattiesburg Police Department on September 10, 2019.  Officer Shelbourn testified that she arrived at Connie Montgomery's home around 2:15 a.m., where she found Spiers.  Officer Shelbourn stated that while speaking with Spiers, she noticed MM and Montgomery on their front porch.  Officer Shelbourn testified that she spoke to MM and Montgomery and ultimately arrested Spiers on charges of residential burglary and attempted sexual battery.  Officer Shelbourn testified that MM was "fearful, scared, [and] disheveled" and that she observed a "small injury" on MM's forearm.  Officer Shelbourn also testified that Montogmery appeared "angry, fearful, [and] somewhat disheveled due to the time of morning."

¶4.     On cross-examination, Officer Shelbourn stated that Officer Broome was the "initial officer on scene."[4]  Officer Shelbourn testified that Montgomery's home was "disheveled" and "cluttered."  She stated that when she entered MM's bedroom, she noticed that it was also "quite cluttered" and filled with "[l]ots of property."  Officer Shelbourn testified that MM's bed was "[a]cross the bedroom against the left wall . . . next to the corner."  Several photos of MM's bedroom were admitted into evidence during Officer Shelbourn's cross-

---

[3] Spiers referred to MM as Katie when speaking with detectives.

[4] Officer Broome was unavailable to testify because he was undergoing surgery.

examination. When asked if photographs were taken of other rooms in the house, Officer Shelbourn testified that she could not recall. Officer Shelbourn stated that when Spiers was searched, no weapons were found on his person. She also testified that she had no knowledge as to whether Spiers had been to Montgomery's residence prior to September 10, 2019.

¶5. On redirect examination, the State discussed the photographs of MM's cluttered bedroom. The State asked Officer Shelbourn to look at Exhibit 10, which depicted MM's bedroom. The photograph showed MM's bed in the far left corner of the room. The room had cups and soda bottles on top of pieces of furniture, a white table with a monitor, and other clutter throughout the room. The State asked Officer Shelbourn, "Is there anything about the amount of items in that room, the layout of that room, that would prevent somebody [from] trying to sexually batter another person?" Officer Shelbourn responded, "Absolutely not."

¶6. MM was the State's next witness. MM testified that she was living with her grandmother, Montgomery, on September 10, 2019.[5] MM testified that her bedroom was "adjacent" to Montgomery's. MM explained that her grandmother always left her front door unlocked every night. MM stated that she was sleeping naked on September 10, 2019, which was "common" for her as no men lived in the home.

¶7. MM testified that around 2:15 a.m. on September 10, 2019, she heard her dogs barking. MM stated that she initially thought they were barking at racoons, which happened

---

[5] MM was nineteen on September 10, 2019.

4

"every night." MM testified that she opened her bedroom door to tell the dogs to stop barking, but she "heard the front door opening." MM testified that she tried to "push" her bedroom door shut, but Spiers "pushed through."[6] MM stated that she was naked when Spiers came into her room. MM testified that Spiers "pushed [her] into a mirror that [she] had and it snapped in half and cut [her]" arm and back.

¶8.     MM testified that Spiers told her "he wanted to talk to [her]. But then he started touching [her]" her breasts and her genitalia. MM stated that she did not consent to Spiers touching her. MM testified that Spiers told her to perform oral sex on him or else he would shoot her. MM testified that when he was making these threats, his penis was "out." MM testified that Spiers told her he had a gun and was "searching through a bag that he had." MM explained that she assumed the gun was in that bag.

¶9.     MM testified that she was screaming for help and tried to "fight [Spiers] off." MM testified that Montgomery came into the room while Spiers was there, and MM told her what was happening. MM stated that her grandmother was "shocked" and told Speris "to get out right now." MM testified that once Spiers left, she stepped outside to talk to the police and saw that Spiers had already been apprehended.

¶10.    MM stated that she did not invite Spiers into her home or into her bedroom. MM also stated that Spiers had never been in her home or invited into her home prior to the incident

---

[6] She testified that at the time, she did not know his name, but she later learned it was Spiers after a meeting with the district attorney. MM also made an in-court identification of Spiers as the man who entered her bedroom on September 10, 2019.

on September 10, 2019. Further, MM testified that she never met Spiers at a tattoo parlor prior to the night of September 10, 2019.

¶11. MM testified that prior to September 10, 2019, she saw Spiers one time. He was outside of Montgomery's house and asked if MM and Montgomery needed someone to cut their yard. They told Spiers no. MM testified that Spiers had later "come around a couple times asking for [her]. But [she] and [her] grandmother were kind of weirded out by him, so [Montgomery] told him that [MM] wasn't there." MM stated that Spiers asked her what her name was and she told him. MM testified that her name was not "Katie."

¶12. On cross-examination, MM testified that she went to bed at 10:00 p.m. on September 9, 2019. MM agreed that she cannot see the front door from her bedroom nor can her bedroom door be seen from the front door. MM stated that the hall light was on when Spiers came into the home. When asked, "How would Mr. Spiers know which door was yours[?]" MM responded, "I don't know. I guess the only way that I can think of is that he heard me open and shut it. Or maybe he saw me. But I didn't see him." MM explained that opening her door can be loud because the doorknob is broken. MM testified that after Spiers pushed her into the mirror, he "dragged [her] by [her] arm" across the floor to take her from the mirror to her bed. MM testified that Spiers never told her he had a gun—only that he was going to shoot her.

¶13. On redirect examination, MM testified that her bedroom window had no curtains or blinds. She agreed that if someone walked around the home, he could see through her bedroom window. The State asked MM "did you go willingly at any time with this man that

6

broke into your home?" MM answered, "No." The State asked, "At any point did you allow him to touch you? . . . To drag you? . . . To push you onto a mirror?" MM answered each question, "No." The State also asked, "Did you allow him to come into the sanctity of your bedroom even if it's a messy bedroom?" MM answered, "No, ma'am." The State asked MM, "If [Spiers] says that you opened the front door of your residence naked and allowed him to come in, is that true?" MM responded, "No."

¶14.    The State's next witness was Montgomery, MM's grandmother. Montgomery testified that it was common for her to leave her front door unlocked. Montgomery stated that MM usually slept "in the nude." Montgomery stated that around 2:00 a.m. on September 10, 2019, she was awakened by her dogs' barking. Montgomery explained this usually happened if they saw an animal or a person outside. Montgomery stated that any time the dogs would start barking at night, MM would "try to get them to quiet down."

¶15.    Montgomery testified that September 10, 2019, after the dogs woke her up, she "kind of waited a minute because they did get quiet. And then I heard [MM] crying. And I knew then something wasn't like just the dogs barking." Montgomery testified that she heard MM say, "Nana, he's going to shoot me."[7] Montgomery testified that she told MM, "I'm coming in," and MM responded, "Nana, don't. He'll shoot you." Montgomery testified that she went into MM's room and saw a "young man on the bed beside [MM] and [MM] was crying." Montgomery testified that she said, "What are you doing in here[?]" and Spiers

---

[7] Spiers's attorney objected to this testimony, arguing that it was hearsay. The trial court overruled this objection, finding that this statement was an excited utterance.

responded, "We were just talking." Montgomery testified that she told Spiers, "I think you need to get out of here."

¶16.   Montgomery testified that Spiers left the home, and she told MM that they needed to call the police.  Montgomery testified that MM was "very upset" and "had some little scratches on her."  Montgomery stated that MM told her "the police are already out there." MM testified that there were "four or five cars" outside of her home.

¶17.   Montgomery could not testify as to whether the mirror in MM's room was broken on September 10, 2019, or if it had been broken previously.  Montgomery testified that Spiers had a backpack, and she thought he may have had a gun in it.  Montgomery stated that law enforcement later told her that Spiers did not have a gun.

¶18.   Montgomery testified that she did not know Spiers, but prior to September 10, 2019, Spiers had "come to our door" and asked MM if they "needed the yard cut."  Montgomery said that Spiers came to her front door on two other occasions.  The first was to "speak" with MM, but she told Spiers that MM "had gone with a friend."  Montgomery testified that on a second occasion, Spiers came to her front door and asked if MM could "take him to . . . either Bellevue or Oloh."  Montgomery testified that MM was never "hanging out" with Spiers.

¶19.   Montgomery testified that she did not give Spiers permission to enter her home on September 10, 2019, or on any other occasion.  Montgomery stated that to her knowledge, MM never gave Spiers permission to enter the home.  Montgomery agreed that MM and

Spiers were not dating and that it was "shocking to find him in [her] granddaughter's bedroom."

¶20.　On cross-examination, Montgomery was asked about the written statement she provided to police on September 10, 2019. She was asked, "Would it surprise you to know that your statement didn't mention anything about [MM] telling you she cried?" She was also asked, "Do you remember telling the police that you heard [MM] scream?" Montgomery responded that MM "had to scream to say 'Nana, he's going to shoot me.'" Montgomery described MM's scream as a "crying scream." Montgomery stated that when her barking dogs woke her up September 10, 2019, she did not hear her front door open or close. She testified that her dogs "would not necessarily want to chase" someone down her hallway. Montgomery was asked, "When [the dogs] were barking, did you hear a man's voice at all in the house?" She responded, "No." She was asked whether she heard "anybody stumble in the hallway as if they were tripping over something[,]" and she responded, "No." She also stated that she did not hear someone threaten MM or hear glass break.

¶21.　Montgomery testified that although she could not hear over her barking dogs, "I wouldn't think that [MM] would have asked a strange man to come into the house." Montgomery testified that for "several nights," the dogs had been barking around the same time. She stated that the exact time was "[a]round midnight to 1:00" in the morning. Montgomery stated that MM was not allowed to have men in her bedroom. She agreed that she was "surprised to see a male in [MM]'s bedroom." Montgomery stated, "it has to be

9

somebody [MM] knows. Not that she would have them in her room. But [MM] is not one to just take up with somebody."

¶22. Montgomery testified that when she opened MM's door and turned the light on, she saw Spiers. Montgomery stated that Spiers had his shirt and pants on, and she did not see his penis. She stated that Spiers "was just looking at something in his hands." Montgomery testified that Spiers told her he was looking for his hat.[8] Montgomery stated that MM told her she "knocked it off" Spiers's head.

¶23. On redirect examination, Montgomery confirmed that she gave a written statement to police "around" 2:15 a.m. on September 10, 2019. Montgomery also confirmed that she "had a chance to read this statement" at 5:18 a.m. that same day. Montgomery testified that she did not remember telling law enforcement that MM was crying when she spoke to them at the scene. Montgomery confirmed that she told law enforcement that MM was "screaming" for her. Montgomery testified that MM told her Spiers touched her "genital area." Montgomery confirmed that she saw blood on MM's leg and arms when she opened MM's door.

¶24. The State's next witness was Detective Antonio Jackson. On direct examination, Detective Jackson stated that he had worked with the Hattiesburg Police Department for fifteen years and had spent the previous three years as a detective for the department. Detective Jackson testified that he interviewed Spiers on September 10, 2019. During

___

[8] Montgomery could not remember what Spiers was looking for, so defense counsel used Exhibit 14, Montgomery's statement to police, to refresh her recollection before asking her again what Spiers was looking for when she opened the bedroom door. Exhibit 14 was marked for identification only.

Detective Jackson's testimony, defense counsel stipulated that "any statement that was rendered by . . . Spiers was voluntarily and intelligently made after waiving his Miranda rights appropriately." The trial court found that Spiers had been properly informed of his *Miranda* rights and that he knowingly and voluntarily waived those rights.[9]

¶25.   Detective Jackson testified that he spoke with Spiers for thirty minutes before Spiers wrote his statement. Detective Jackson testified that Spiers's statement did not include everything Spiers had told Detective Jackson prior to his writing of the statement. The State asked Detective Jackson to recall what Spiers told him in his interview. Detective Jackson stated:

> He told me on the morning of September 10, 2019, he went to a friend's house . . . but nobody answered the door. So then he went to [Montgomery's residence], and that's when he knocked on the door and a white female known as Katie, she opened the door and let him in because he wanted to use the phone. He advised that they walked down the hallway to her bedroom. He advised that when they got to the bedroom, she tripped and fell on a mirror. And he advised that she gave him the phone and then she started screaming. And he told her to calm down and that's when the grandmother entered the room and told him to leave the residence.

Detective Jackson testified that Spiers told him that when "Katie"[10] opened the front door, "she didn't have any clothes on," and "[s]he grinned." Detective Jackson stated that Spiers admitted to going into MM's bedroom.

¶26.   Detective Spiers then read the first paragraph of Spiers's statement from Exhibit 16:

---

[9] Exhibit 15, Spiers's waiver of his *Miranda* rights, and Exhibit 16, Spiers's handwritten statement, were admitted into evidence.

[10] Throughout his interview with Detective Jackson, Spiers referred to MM as "Katie." Detective Jackson acknowledged that "Katie" was not MM's real name.

I left Walmart going to my friends . . . When I got there, they were asleep, so I walked around the corner to Katie's, which I met a few times. Katie opened the door. I asked if I can use the phone or sleep on the couch so I can get out of the streets. She told me to come on. When she got to her room, she went to give me the phone. And when I was about to make a call, she started screaming, "He has a gun." I told her to calm down, I have no gun. And her grandma came in and asked if I would leave. I said yes, ma'am and walked out.

Detective Jackson was also asked about the "Q and A" portion of Spiers's statement. Detective Jackson testified that he asked Spiers when he met "Katie," and Spiers responded, "June 2019 . . . at her house." Detective Jackson stated that Spiers told him that "Katie opened the door and let him in," but he did not have any "physical contact with Katie" while he was in the home. Detective Jackson stated that Spiers told him he did not threaten to shoot "Katie" nor did he "expose" himself to "Katie." Detective Jackson stated that at no point during the verbal interview with Spiers or at any point in Spiers's statement did Spiers mention having a hat, MM knocking his hat off, or being unable to find his hat.

¶27. Detective Jackson testified that based on Spiers's statements, he concluded that the "contact" between Spiers and MM "was not consensual." Detective Jackson explained that he came to that conclusion because Spiers's statement that MM "screamed once she gave him the phone . . . struck me as odd because somebody that would consensual contact, you know, I wouldn't expect them to scream once they gave somebody the phone." Detective Jackson stated that the reason Spiers was charged with residential burglary and sexual battery is because Spiers "admitted to going into the residence being in the bedroom with [MM]. . . . And the grandmother and [MM] . . . advised that he did not have permission to be in that residence and attempted sexual battery had occurred in [MM's] bedroom."

12

¶28.    On cross-examination, Detective Jackson testified that he did not investigate the crime scene or interview MM or Montgomery. Detective Jackson stated that there were no signs of forced entry at Montgomery's residence. Detective Jackson was asked whether Spiers mentioned "anything about the dogs being aggressive," and he responded that Spiers "said they were barking when he entered." Detective Jackson was also asked, "[Y]ou have to agree that the physical evidence entirely matches everything that . . . Spiers says?" Detective Jackson responded, "Yes, sir." Detective Jackson also confirmed that no weapon was found on Spiers.

¶29.    On redirect examination, Detective Jackson testified that he knew Spiers told an officer at the crime scene that he met "Katie" at a tattoo parlor prior to September 10, 2019, but Spiers never told Detective Jackson this in his statement. Detective Jackson was asked whether the physical evidence from the scene was "also consistent with [MM's] statement," and he responded, "Yes." Detective Jackson stated that the physical evidence was also consistent with Montgomery's statement.

¶30.    After Detective Jackson's testimony, the State rested. The Defense did not call any witnesses. The jury was dismissed, and jury instructions were discussed. The State objected to proposed jury instruction D-8, which concerned Spiers's affirmative defense of consent.

¶31.    The trial court determined that Spiers was "entitled to some kind of instruction on consent. But it needs to be something that's supported by a model instruction or the law." The trial court stated that "the defendant is not required to prove an affirmative defense beyond a reasonable doubt by clear and convincing evidence." The trial court instructed the

13

State and Spiers's attorney to "work together and come up with . . . an instruction on consent."

¶32.    After a brief recess, the judge returned and Spiers's attorney presented the new jury instruction to the court. The new instruction read:

> Consent is an affirmative defense to the charge of burglary. . . . The defendant bears the burden of proving by clear and convincing evidence that [MM] consented impliedly or expressly to . . . Spiers entering the residence . . . by voluntarily opening the door and letting him enter. If you find by clear and convincing evidence that [MM] consented to . . . Spiers entering [the residence], you must find [Spiers] not guilty of burglary of a dwelling.

Spiers made no objection to this instruction. The State agreed to this new instruction but also expressed a concern. The State explained that based on the case law and model jury instructions available, "depending on the type of affirmative defense that is raised, there is a different burden." The State continued, stating that for some affirmative defenses, the burden of proof is beyond a reasonable doubt, others require clear and convincing evidence, while other defenses do not require defendants to "prove the truth of anything." The State concluded that clear and convincing evidence was appropriate, considering that it "is the lowest standard that we can think of." The trial court acknowledged the State's concern and accepted the new jury instruction for the affirmative defense of consent. This became jury instruction 7.

¶33.    On November 16, 2021, Spiers was convicted of burglary of a dwelling and attempted sexual battery.[11]  Spiers was sentenced to serve twenty-five years under the supervision of the MDOC for the conviction of burglary of a dwelling, and he was sentenced to thirty years

---

[11] Spiers's motion for new trial or judgment notwithstanding the verdict was denied.

under the supervision of the MDOC for the conviction of attempted sexual battery. The attempted-sexual-battery sentence was ordered to run consecutively with the burglary-of-a-dwelling sentence. Spiers appealed and raised two issues: (1) whether the trial court erred by granting a jury instruction that placed the burden on Spiers to prove by clear and convincing evidence the affirmative defense of consent; and (2) whether the State engaged in prosecutorial misconduct in its closing argument. Upon review of the record, this Court affirms Spiers's convictions.

1. **Spiers waived the issue of whether the trial court erred by granting a consent jury instruction that required him to prove consent by clear and convincing evidence.**

a. **Jury Instruction**

¶34. Spiers argues that the trial court erred when it granted a jury instruction proposed by his defense counsel and the State, which required Spiers to prove MM consented to his entry into her home by clear and convincing evidence. "This Court reviews jury instructions under an abuse-of-discretion standard." **Roby v. State**, 183 So. 3d 857, 872 (Miss. 2016) (citing **Thompson v. State**, 119 So. 3d 1007, 1009 (Miss. 2013)). The instructions must be read "as a whole to determine if the jury was properly instructed." **Id.** (citing **Johnson v. State**, 908 So. 2d 758, 764 (Miss. 2005)). "If the instructions as a whole 'fairly announce the law of the case and create no injustice,' this Court will not reverse." **Id.** (quoting **Johnson**, 908 So. 2d at 764).

¶35. The State objected to Spiers's initial jury instruction, D-8. That instruction read:

> Spiers's proposed jury instruction, D-8, reads: "Consent is an affirmative defense to the charge of burglary . . . Spiers is not required to establish the

15

truth of the consent to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether Spiers was expressly or impliedly invited by [MM] into the residence, then you must give . . . Spiers the benefit of any reasonable doubt and find . . . Spiers not guilty."

The trial court instructed the State and Spiers's attorney to write a new jury instruction together. After a brief recess, Spiers's attorney presented jury instruction 7. It read:

Consent is an affirmative defense to the charge of burglary. . . . The defendant bears the burden of proving by clear and convincing evidence that [MM] consented impliedly or expressly to . . . Spiers entering the residence . . . by voluntarily opening the door and letting him enter. If you find by clear and convincing evidence that [MM] consented to . . . Spiers entering [the residence], you must find [Spiers] not guilty of burglary of a dwelling.

Spiers did not object to this instruction at trial.

¶36. Because Spiers's attorney and the State collaborated on this jury instruction and because Spiers failed to object, Spiers has waived his right to appeal this issue.[12] This Court has stated that a defendant's "failure to object to [a jury] instruction at trial bars that issue on appeal." **Odom**, 861 So. 2d at 296 (citing **Jones v. State**, 776 So. 2d 643, 653 (Miss. 2000)). "Further, when a party acquiesces to the giving of a jury instruction, that party is procedurally barred from later raising an error with the instruction on appeal." **Williams v. State**, 234 So. 3d 1278, 1287 (Miss. 2017).

---

[12] Spiers also argues that the error of allowing jury instruction 7 to be used was "amplified" by jury instruction 18, which defined clear and convincing evidence for the jury. Specifically, Spiers argues that the jury instruction assigning him the burden to prove by clear and convincing evidence and the instruction defining clear and convincing evidence placed the standard of proof "above" the criminal standard. Again, Spiers did not object to this instruction, so he is barred from raising the issue on appeal. **Missala Marine Servs., Inc. v. Odom**, 861 So. 2d 290, 296 (Miss. 2003).

16

¶37. Spiers's case is similar to *Williams*. In that case, jury had been instructed on two legal theories of murder, including aiding and abetting. *Id.* at 1286-87. Williams did not object to the State's jury instructions, and Williams requested her own aiding and abetting instruction. *Id.* at 1287. Because Williams acquiesced to the State's instructions and requested her own aiding and abetting instruction, this Court found that Williams had waived her right to raise the issue of the jury instruction on appeal. *Id.*

¶38. Like Williams, Spiers waived his right to raise this issue on appeal. Spiers's attorney requested the consent jury instruction. The State objected to the instruction as it was written, so the State and Spiers's attorney collaborated to write a new jury instruction for the affirmative defense of consent. No objection from either party was made against this new jury instruction. Further, Spiers "acquiesced" in the creation and submission of this new jury instruction. *Id.*

¶39. The dissent argues that Spiers's counsel "openly disagreed" with the jury instruction. Diss. Op. ¶ 1. A full review of the in-court discussion about the proposed jury instruction, however, shows that Spiers's counsel never "openly disagreed" with jury instruction 7:

> **[State]**: [I]t's clear that the issue of consent is an affirmative defense. It is not something that the State has to prove as an element of the crime of burglary. . . . . [W]e looked up affirmative defense instructions. And the particular one that Ms. Denham sent to me, it was entrapment. But I don't think that that matters what the crime is or what the affirmative defense is. The question is, what is the law of affirmative defense, what's the burden. And in that instruction, it clearly says the defendant has the burden of proving this defense by clear and convincing evidence. . . . What she was able to find based on this instruction presented, is that it looks to be taken out of the alibi defense . . . . The defendant is not required to establish the truth of the alibi to your satisfaction . . . . I will concede that . . . the defendant, through the State, has stated that it was a consensual encounter getting into the house. And the State

17

has said that it's not. So we would ask that that particular phrase of that, Brandon Spiers is not required to establish the truth of the consent to your satisfaction be removed from the consent instruction. And . . . if that is done, it would more accurately reflect what the evidence shows and it would allow the defense the opportunity to present their defense in the form of a jury instruction.

. . . .

**[State]**: And Judge, . . . the defense says that's a model jury instruction for consent. I can find no model jury instruction for consent from the State of Mississippi. And I've looked at some other model jury instructions and it doesn't have that language in there about that line, about proving the truth. The only one that did was alibi.

. . . .

**[Spiers]**: I rely on *Bowman*.[13] And I would like to point out the State is in error in comparing this to entrapment. Because entrapment has a specific statutory defense.

**The Court**: That is not an entrapment case. This is a consent case . . . . But consent according to *Bowman* is an affirmative defense rather than an essential element. I think you are entitled to some kind of instruction on consent. But it needs to be something that's supported by a model instruction or the law.

. . . .

**[Spiers]**: [Consent] is an affirmative defense . . . . I don't think we're disputing that. Nor is there a dispute my client is entitled to it. I think it's just an issue of what the appropriate language is.

**The Court**: We need to get with it. What is it in this instruction that the State would be agreeable to if certain language was taken out?

. . . .

**[State]**: And just for the record, Judge, because I would like this when they maybe possibly look at this one day. [O]n attempt abandonment of intent to commit a crime, that's also an affirmative defense that he abandoned . . . . [I]t

---

[13] ***Bowman v. State***, 283 So. 3d 154 (Miss. 2019).

says in . . . the model jury instruction, if you find from the evidence beyond a reasonable doubt that the defendant freely and voluntarily abandoned his or her intent to commit a crime. That is our concern is that if he wants to assert an affirmative defense . . . . He still has to prove that affirmative defense beyond every reasonable doubt. And then we have the burden to disprove it. But it doesn't say that in his instruction. It just basically if you just say it, asserting it all of a sudden switches it back to us.

. . . .

**The Court**: [T]he defendant is not required to prove an affirmative defense beyond a reasonable doubt by clear and convincing. So y'all, if you can, work together and come up with— he's entitled to an instruction on consent. So y'all work together for a few minutes and see if you can figure that out.

. . . .

**The Court**: We're back on the record. As to D-8, counsel for the defendant and State have worked through this issue. Do you have an announcement to make?

**[Spiers]**: Yes, Your Honor. As it's my instruction, I would like to go ahead and make the announcement and the State can correct me if I err.

**The Court**: I think that's only fair.

**[Spiers]**: I propose to modify D-8 by striking the last sentence and replacing it with the following: The defendant bears the burden of proving by clear and convincing evidence that [MM] consented impliedly or expressly to . . . Spiers entering the residence . . . by voluntarily opening the door for him.

**The Court**: Is the State agreeable to that?

**[State]**: Yes, Your Honor. I would point out just one thing. And this is just me being cautious. I would ask the Court to view this and make its own determination. I can tell you that the State does not disagree with that modification. My only concern is looking at the case law and looking at the jury instructions, depending on the type of affirmative defense that is raised, there is a different burden . . . . We're assuming clear and convincing, which is the lowest standard that we can think of.

**The Court**: That's to the defendant's benefit.

19

**[State]**: Yes, sir.

. . . .

**[Spiers]**: And there would be one additional sentence . . . after stating what the burden is and say if you find by clear and convincing evidence that . . . Spiers had consent to enter the residence, you must find him not guilty of residential burglary.

The record shows that there was a disagreement about the language of Spiers's original jury instruction, D-8, not a disagreement about the finalized language in jury instruction 7. The record also shows that Spiers's attorney presented the instruction as his own when both parties returned from writing the instruction together. The State was the only party to voice any concern with requiring Spiers to prove consent by clear and convincing evidence. At no point did Spiers's attorney object to jury instruction 7, nor did he openly disagree on the record with the jury instruction. Therefore, Spiers has waived this issue on appeal.

¶40. The dissent further argues that this issue has been preserved on appeal and constitutes reversible error. But because we find that this issue has been waived, we apply a plain error analysis. There is "no per se rule requiring automatic reversal whenever jury instructions contain conflicting or potentially confusing explanations of the law. In such cases, we apply traditional harmless-error or plain-error analysis, depending upon whether the defendant objected to the instruction at trial." ***Johnson v. State***, 290 So. 3d 1232, 1240 (Miss. 2020) (quoting ***Rodgers v. State***, 166 So. 3d 537, 544 (Miss. Ct. App. 2014)). Because Spiers failed to object to the instruction and because his attorney did not openly disagree with the language of jury instruction 7, this Court must conduct a plain error analysis.

20

¶41.    "Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law." *Ambrose v. State*, 254 So. 3d 77, 111 (Miss. 2018) (quoting *Armstead v. State*, 196 So. 3d 913, 916 (Miss. 2016)).  The plain error doctrine applies when there has been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings. *Ambrose*, 254 So. 3d at 136 (quoting *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012)).  "To determine if plain error has occurred, this Court must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.'" *Conner v. State*, 138 So. 3d 143, 151 (Miss. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)).

¶42.    "Prejudice is often lacking when the weight of the evidence against a defendant is overwhelming." *Hall v. State*, 201 So. 3d 424, 430 (Miss. 2016) (internal quotation marks omitted) (quoting *Moffett v. State*, 156 So. 3d 835, 870 (Miss. 2008)).When determining whether sufficient evidence supports a conviction, this Court must decide whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Shelvy v. State*, 293 So. 3d 823, 826 (Miss. 2020) (internal quotation marks omitted) (quoting *Naylor v. State*, 248 So. 3d 793, 796 (Miss. 2018)).  The prosecution is given the benefit of all favorable inferences reasonably drawn from the evidence. *Id.*

¶43.    Spiers was convicted of burglary of a dwelling.  "Under Mississippi Code Section 97-17-23(1) (Rev. 2020), '[b]urglary of a dwelling has two elements: (1) unlawful breaking and entering, and (2) intent to commit a crime therein.'"  *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (alteration in original) (quoting *Alston v. State*, 287 So. 3d 182, 185 (Miss. 2019)).

¶44.    The State proved Spiers unlawfully broke and entered into Montgomery's home.  This Court defines an actual breaking as "any act or force, however[ ] slight, 'employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed.'" *Id.* 110 (alteration in original) (internal quotation marks omitted) (quoting *Johnson v. State*, 235 So. 3d 1404, 1410 (Miss. 2017)).  Spiers committed an "unlawful breaking and entering" by opening the unlocked front door and entering the home without MM's or Montgomery's permission.  The State relied on testimony from MM and Montgomery to prove Spiers did not have permission to enter into the home through the unlocked door.

¶45.    MM testified that her grandmother always left the front door unlocked.  MM testified that around 2:15 a.m. on September 10, 2019, she heard her dogs barking and opened her bedroom door to tell them to be quiet when she heard the front door open.  MM tried to "push" her bedroom door shut, but Spiers "pushed through."  MM testified that she never invited Spiers into her home on September 10, 2019, nor had she ever invited him into her home before.

¶46.    Montgomery testified that on the morning of September 10, 2019, she heard her dogs barking and shortly after, she heard MM crying.  Montgomery testified about three occasions

22

when Spiers had come to her home prior to September 10, 2019. Spiers came by to offer to mow Montgomery's grass, and she turned him away. Spiers also came by Montgomery's house on two other occasions and asked to talk to MM or asked for MM to drive him somewhere. Montgomery testified that both times, she told him MM was not available. MM also stated that she never gave Spiers permission to enter her home.

¶47. The jury also heard evidence from Spiers's oral and written statements to police. In his statement, Spiers stated that "Katie" opened the front door and "told me to come on." Detective Jackson also testified that Spiers admitted to police that he entered Montgomery's residence and went to MM's room.

¶48. The State also proved that Spiers unlawfully entered Montgomery's home with the intent to commit a crime. In this case, the crime was the attempted sexual battery of MM. The State proved that Spiers intended to commit this crime and ultimately convicted him of attempted sexual battery.

¶49. Mississippi Code Section 97-3-95(1)(a) reads: "A person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a]nother person without his or her consent[.]" Miss. Code Ann. 97-3-95(1)(a) (Rev. 2020). A person is guilty of an attempted crime when he "design[s] and endeavor[s] to commit an offense, and . . . [does] any overt act toward the commission therof" but fails. Miss. Code Ann. 97-1-7(1) (Rev. 2020). To prove attempted sexual battery, the State had to show: "(1) an intent to commit [sexual battery]; (2) a direct [overt] act done toward its commission; and (3) the failure to consummate its commission." *Green v. State*, 269 So. 3d 75, 82 (Miss. 2018) (second alteration in original)

(internal quotation mark omitted) (quoting ***Brooks v. State***, 18 So. 3d 833, 841 (Miss. 2009)); ***Ishee v. State***, 799 So. 2d 70, 763 (Miss. 2001).

¶50.   The State proved Spiers intended to commit sexual battery, executed a direct, overt act toward the commission of sexual battery, and failed to complete the crime.  Officer Shelbourn testified that when she arrived at Montgomery's house, she saw MM and Montgomery on the front porch.  Officer Shelbourn stated that she noticed injuries to MM's forearm, and she noticed that both MM and Montgomery were "fearful."  Officer Shelbourn testified that based on what MM and Montgomery told her, she arrested Spiers on charges of residential burglary and attempted sexual battery.

¶51.   MM testified that after Spiers "pushed through" her bedroom door, he pushed her into a mirror that snapped in half and cut her.  MM testified that Spiers started touching her breasts and genitalia.  MM testified that she never consented to Spiers touching her.  MM testified that Spiers threatened to shoot her if she did not perform oral sex on him.  MM stated that when Spiers was threatening her, his penis was "out."  MM testified that her grandmother came into the room and told Spiers to "get out right now."  She stated that Spiers left immediately.

¶52.   Montgomery testified she heard MM crying, and when she went to the door, MM said, "Nana, he's going to shoot me."  Montgomery stated that when she opened MM's bedroom door, she saw Spiers on the end of the bed, and she saw MM "up the bed crying."  Montgomery testified that Spiers was wearing a shirt and pants, and she did not see his penis.  Montgomery stated that MM told her Spiers had touched her "genital area."

¶53.    Spiers wrote in his statement to police that when he got to "Katie's" bedroom, she gave him her phone so he could make a call. Spiers stated that "Katie" began screaming, "He has a gun," and he told her "calm down, I have no gun." Spiers stated that Montgomery entered the room and told him to leave, so he left the home.

¶54.    Detective Jackson testified that Spiers had told him that "Katie" had opened the front door without any clothes on and grinned at him. Detective Jackson stated that Spiers denied threatening to shoot MM or exposing himself to MM. Detective Jackson ultimately determined that the contact between Spiers and MM had not been consensual because she started screaming as soon as she gave Spiers her phone.

¶55.    The jury is the ultimate trier of fact and the "final arbiter of a witness's credibility." *Howell v. State*, 860 So. 2d 704, 731 (Miss. 2003) (internal quotation mark omitted). The jury determines the weight and worth of conflicting testimony. *Id.* At trial the jury listens to the evidence presented, observes the witnesses' demeanor, determines each witnesses' credibility, and decides what weight to give pieces of evidence. *Bridges v. State*, 716 So. 2d 614, 617 (Miss. 1998) (quoting *Groseclose v. State*, 440 So. 2d 297, 300-01 (Miss. 1983)).

¶56.    Here, the jury heard testimony from Officer Shelbourn, Montgomery, MM, and Detective Jackson about what happened in the early morning hours of September 10, 2019. The jury also heard Spiers's written statement to police. The jury took all of this evidence, assigned weight to each piece of it, and ultimately convicted Spiers of burglary of a dwelling and attempted sexual battery. In reviewing the evidence in a light most favorable to the

State, this Court finds that the State proved the essential elements of burglary and attempted sexual battery.

¶57.    When determining the weight of the evidence, this Court will not act as the thirteenth juror. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). This Court does not make "independent resolutions of conflicting evidence." *Id.* This Court will not "reweigh the evidence or make witness-credibility determinations." *Id.* "[W]e weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id.* (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

¶58.    As determined above, the jury weighed the evidence, determined witness credibility, and made independent resolutions of conflicting evidence. Therefore, this Court finds that the jury's verdict was not contrary to the overwhelming weight of the evidence presented at trial.

¶59.    Because the verdict was not contrary to the overwhelming weight of the evidence presented at trial, Spiers cannot show prejudice, a necessary prong of the plain error doctrine. Therefore no reversible, plain error occurred.

### b.    Ineffective Assistance of Counsel

¶60.    On direct appeal, Spiers argues that his trial counsel was ineffective for drafting an erroneous jury instruction and for failing "to object to improper commentary" by the prosecution during closing arguments. "[G]enerally, ineffective-assistance-of-counsel claims

26

are more appropriately brought during post-conviction proceedings." ***Ross v. State***, 288 So. 3d 317, 324 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting ***Bell v. State***, 202 So. 3d 1239, 1242 (Miss. 2016)).

> This Court will address such claims on direct appeal when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed."

***Id.*** (alterations in original) (quoting ***Bell***, 202 So. 3d at 1242).

¶61.    We addressed this Court's standard for an ineffective-assistance-of-counsel claim in ***Dartez v. State***:

> In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. ***Holly v. State***, 716 So. 2d 979, 989 (Miss. 1998) (applying the two-pronged test announced in ***Strickland v. Washington***, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). We look at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial. ***Id.*** There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. ***Id. Only where it is reasonably probable that, but for the attorney's errors, the outcome would have been different, will we find that counsel's performance was deficient.***

***Dartez v. State***, 177 So. 3d 420, 423 (Miss. 2015) (emphasis added).

¶62.    Spiers was charged with burglarizing the home of MM and her grandmother. MM testified that a man, whom later she identified as Spiers, opened the door to her home and made his way to her bedroom. He then pushed open her bedroom door and threatened to shoot her if she did not perform oral sex on him. She stated that she did not give Spiers permission to enter her home or her bedroom.

27

¶63.    Spiers did not testify, but his oral and written statements to police were admitted into evidence. Spiers stated that on the morning of the alleged burglary, he went to a friend's home, but no one answered the door. So he went to MM's home, knocked on the door, and asked to use the phone. MM invited him in and led him to her bedroom. Once they reached the bedroom, MM tripped and fell on a mirror. She then gave Spiers her phone and started screaming for her grandmother. MM's grandmother came into MM's bedroom and told Spiers to leave. Ultimately, Spiers argued that MM consented to him entering her home.

¶64.    Spiers's counsel sought to embody the consent defense in jury instruction 7, which he wrote in collaboration with the prosecution.  Spiers argues that instruction 7 placed an improper burden on him to prove the affirmative defense of consent. And, because his counsel was involved in offering the instruction, Spiers argues that his counsel was ineffective.

¶65.    Assuming arguendo that Spiers could show that the burden was incorrectly stated and that his counsel's performance was deficient, he still cannot show the outcome of his trial was prejudiced by that claimed deficiency. Spiers was charged with burglary.  Instruction S-1 instructed the jury on these elements and the prosecution's burden of proof:

> The Defendant, Brandon Jake Spiers, has been charged in COUNT I with the crime of Burglary of a Dwelling.
>
> If you find from the evidence in this case, beyond a reasonable doubt,
>
> 1.    Brandon Jake Spiers, on or about September 10th, 2019, in Forrest County, Mississippi;
>
> 2.    Did unlawfully break and enter;

28

3. The dwelling house of Connie Montgomery and/or M.M., located at [address], Hattiesburg, MS, while occupied;

4. With the intent to commit the crime of Sexual Battery therein; then you shall find the defendant, Brandon Jake Spiers, guilty as charged for Burglary of a Dwelling.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant not guilty of Burglary of a Dwelling.

¶66. The jury was also instructed on the definition of breaking in instruction D-6:

Brandon Spiers is charged in Count I of the indictment with Burglary of a Dwelling. One element of Burglary of a Dwelling is breaking. "Breaking" is any act of force or threat of force, regardless of how slight, necessary to be used in entering the dwelling. The turning of a knob, a slight push to further open the door, the rising of a latch- these, and like acts are sufficient.

The jury was presented with these instructions on burglary and breaking, and it found that the prosecution proved each of the elements of burglary beyond a reasonable doubt.

¶67. Regardless of whether the consent instruction Spiers complains of improperly stated the burden for the consent defense, the jury found, based on the other instructions, that the prosecution proved, beyond a reasonable doubt, that Spiers broke into MM's dwelling. That necessarily means it did not accept Spiers's version that MM opened the door and invited him in, which would not constitute breaking into a dwelling. Spiers is, therefore, unable to show that the consent instruction and his counsel's role in drafting it prejudiced the outcome of his case. Thus, Spiers's ineffective assistance of counsel claim as to the consent jury instruction fails.

### 2. The State did not engage in prosecutorial misconduct during its closing argument.

#### a. Prosecutorial Misconduct: Closing Argument

29

¶68. Spiers also argues that the state engaged in prosecutorial misconduct in its closing argument. This Court has explained, "Where a prosecutor has made an improper argument, the question on appeal is 'whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created.'" *Moffett*, 156 So. 3d at 869 (internal quotation marks omitted) (quoting *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997)).

¶69. When reviewing the potential for prosecutorial misconduct during closing argument, "it is necessary to examine the surrounding circumstances to be careful not to take a statement out of context." *Grayson v. State*, 118 So. 3d 118, 140 (Miss. 2013) (internal quotation marks omitted) (quoting *Spicer v. State*, 921 So. 2d 292, 318 (Miss. 2006), *abrogated by O'Connor v. State*, 120 So. 3d 390 (Miss. 2013))). In the present case, the statement at issue was made during the rebuttal portion of the prosecution's closing statement. It reads in full:

> We wonder why victims don't come forward. We say why won't they prosecute? Why won't they come forward? Why won't they speak out? If we hadn't been handed this week, yesterday and today, a clear example of why they do not. I think the evidence shows because not only do you have to fight to not be sexually battered in your own home when it happens, but you also have to fight against this at trial. To be accused of basically being a whore and sneaking in homeless men into your bedroom at night because you want to I guess sleep with them and not tell grandma and then make up this elaborate sociopath lie to make yourself look good. How does this make [MM] look good? How does any of this benefit her? We wonder why victims don't go forward because we second-guess everything they do.

Spiers did not object to these statements at trial. For the first time on appeal, he argues that this remark by the prosecution was an "improper comment by the State, criticizing a

30

defendant exercising his right to trial," and it breached other "warnings made to prosecutors on improper commentary." As a result of Spiers's counsel's failure to object at trial, Spiers asks this Court to review this issue for plain error. "Generally, a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred." *Swinney v. State*, 241 So. 3d 599, 605 (Miss. 2018) (internal quotation marks omitted) (quoting *Parker v. State*, 30 So. 3d 1222, 1227 (Miss. 2010)).

¶70. This Court has held the plain error doctrine will be applied to closing arguments when the "substance of the statement is 'out of bounds for closing arguments.'" *Boyd v. State*, 977 So. 2d 329, 337 (Miss. 2008) (quoting *Minor v. State*, 831 So. 2d 1116, 1124 (Miss. 2002)). To determine whether the statement was out of bounds, we must find that "the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *Ambrose*, 254 So. 3d at 130 (internal quotation mark omitted) (quoting *O'Connor*, 120 So. 3d at 399).

¶71. "Attorneys are to be given wide latitude in making their closing arguments." *Evans v. State*, 226 So. 3d 1, 31 (Miss. 2017) (internal quotation marks omitted) (quoting *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988)). But "prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2000) (citing *Hiter v. State*, 660 So. 2d 961, 966 (Miss. 1995)). As this Court held in *Brewer v. State*:

> [s]o long as counsel in his address to the jury keeps fairly within the evidence
> and the issues involved, wide latitude of discussion is allowed; but when he

departs entirely from the evidence in his arguments or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence, the trial judge should intervene to prevent unfair argument.

*Brewer v. State*, 704 So. 2d 70, 72 (Miss. 1997) (alteration in original) (quoting *Clemons v. State*, 320 So. 2d 368, 371-72 (Miss. 1975)).

¶72.    "Given the latitude which counsel is to be afforded, and considering the content of the statements, [counsel] was within the permissible bounds of closing argument, for the statements were supported by the evidence adduced." *Moffett*, 156 So. 3d at 857. Counsel for the prosecution did not comment on the defendant's right to a jury trial, ask the jurors to put themselves in the place of the victim, or tell the jury to send a message, as Spiers argues. Instead, counsel called into question the plausibility of the defendant's version of the events. And it is clear from the record that counsel's comments about victims not coming forward were in response to defense counsel's statements that MM lied in order to make herself look good. The comments did not "depart[] entirely from the evidence," were not "intended solely to excite the passions or prejudices of the jury," and were not "inflammatory or damaging statements of fact not found in the evidence." *Brewer*, 704 So. 2d at 72.

¶73.    Because counsel for the prosecution did not make improper comments, Spiers's claim of error on this issue fails.

### b.    Ineffective Assistance of Counsel

¶74.    Again, Spiers argues in the alternative that we should find that his counsel was ineffective for failing to object to the prosecutor's closing argument statements. This claim must also fail, for it requires the defendant to show that the outcome of his trial was

32

prejudiced by counsel's deficient performance. *Dartez*, 177 So. 3d at 423; *see Evans v. State*, 294 So. 3d 1152, 1169 (Miss. 2020) ("[T]his Court's direct-appeal ruling that 'no plain error occurred' rules out the possibility of *Strickland*-level prejudice."). The record affirmatively shows there was no such prejudice.

## CONCLUSION

¶75. This Court affirms Spiers's convictions.

¶76. **AFFIRMED.**

**RANDOLPH, C.J., BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND COLEMAN, J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶77. During jury instruction discussions, Brandon Spiers openly disagreed with the State's assertion that Spiers was required to prove his defense of consent to burglary by clear and convincing evidence. The trial court, however, instructed the parties to confer and submit a jury instruction containing the clear and convincing evidence standard. Because the trial court instructed the parties to submit the jury instruction with that standard after defense counsel voiced his disagreement, I respectfully disagree with the majority's conclusion that Spiers waived his right to appeal this issue. Further, I would find that the prosecutor's statements during closing arguments were inflammatory and highly prejudicial.

## I. Improper Jury Instruction

¶78. "Our standard for review of a trial judge's decision to grant or refuse a jury instruction is well known: We review the instructions as a whole 'to determine if the jury was properly

33

instructed,' giving abuse-of-discretion deference to the trial judge's decision." ***Flowers v. State***, 51 So. 3d 911, 912 (Miss. 2010) (quoting ***Rubenstein v. State***, 941 So. 2d 735, 787 (Miss. 2006)).

¶79. The elements of burglary are: "(1) unlawful breaking and entering, and (2) intent to commit a crime therein." ***Brady v. State***, 337 So. 3d 218, 230 (Miss. 2022) (internal quotation marks omitted) (quoting ***Burford v. State***, 320 So. 3d 502, 515 (Miss. 2021)). Spiers's theory of defense was that MM had invited him into the house and that he, therefore, had not unlawfully entered. The State conceded that Spiers was entitled to a jury instruction on the defense of consent. When going over jury instructions, however, the parties initially were unclear about the appropriate standard for the defense of consent to burglary. After conducting research, the State submitted that consent was an affirmative defense and compared it to the defense of entrapment, in which the defendant had the burden of proving the entrapment defense by clear and convincing evidence. Defense counsel agreed that consent was an affirmative defense but argued that the State was in error by comparing the defense of consent to the defense of entrapment and the clear and convincing standard, because the defense of entrapment required clear and convincing evidence by statute.

¶80. The State next submitted that the defendant had the burden to prove consent beyond every reasonable doubt. Defense counsel again disagreed. The trial court then instructed,

> Well, you are not required to—the defendant is not required to prove an affirmative defense beyond a reasonable doubt [but] by clear and convincing. So y'all, if you can, work together and come up with—he's entitled to an instruction on consent. So y'all work together for a few minutes and see if you can figure that out.

34

The parties conferred and proffered Jury Instruction No. 7, which stated:

> Brandon Spiers is charged in Count 1 of the indictment with Burglary of a Dwelling. Consent is an affirmative defense to the charge of burglary. In this case, Brandon Spiers asserts the defense of consent by claiming that [MM] voluntarily let him enter the residence . . . . The defendant bears the burden of proving by clear and convincing evidence that [MM] consented impliedly or expressly to Brandon Spiers entering the residence . . . by voluntarily opening the door and letting him enter. If you find by clear and convincing evidence that [MM] consented to Brandon Spiers entering [the residence], you must find Brandon S[p]iers not guilty of burglary of a dwelling.

¶81. The above exchange shows that defense counsel did openly disagree with the State's contention that the burden is on the defendant to prove the defense of consent to burglary with clear and convincing evidence. Spiers submitted the consent instruction only after the court instructed the parties to draft an instruction using a clear and convincing standard. Accordingly, I would find that the trial court's direction to submit a jury instruction using the clear and convincing standard resulted in reversible error.

¶82. It is clear that "[t]he ultimate responsibility of assuring that the jury is properly instructed on all relevant issues of law in a case falls upon the trial judge." *Brown v. State*, 39 So. 3d 890, 900 (Miss. 2010); *see also **Conner v. State***, 138 So. 3d 143, 149 (Miss. 2014) ("The trial court must 'assure that the jury is "fully and properly instructed on all issues of law relevant to the case."'" (quoting *Harrell v. State*, 134 So. 3d 266, 270 (Miss. 2014))). "[W]here . . . the trial judge has applied an erroneous legal standard, we should not hesitate to reverse." *Meeks v. State*, 781 So. 2d 109, 113 (Miss. 2001) (second alteration in original) (internal quoation marks omitted) (quoting *McClendon v. State*, 539 So. 2d 1375, 1377 (Miss. 1989)). Further, "[i]t is, of course, an absolute right of an accused to have every lawful

defense he asserts . . . to be submitted as a factual issue to be determined by the jury *under proper instruction of the court*. This Court *will never permit* an accused to be denied this fundamental right." ***Chinn v. State***, 958 So. 2d 1223, 1225 (Miss. 2007) (first alteration in original) (emphasis added) (quoting ***O'Bryant v. State***, 530 So. 2d 129, 133 (Miss. 1988)).

¶83.    Here, the jury was improperly instructed that Spiers bore the burden of proving by clear and convincing evidence that MM had consented to his entering the residence. Defense counsel correctly objected to the State's contention that consent was akin to the theory of entrapment. The defense of entrapment is required to be proved by clear and convincing evidence by statutory directive. *See* Miss. Code Ann. § 99-1-25 (Rev. 2020). No such directive exists for the defense of consent.

¶84.    Instead, as this Court has long held, "[w]hen a defendant attempts to prove an affirmative defense . . . it is his burden to prove that such circumstances exist so as to substantiate such a defense." ***Stodghill v. State***, 892 So. 2d 236, 239 (Miss. 2005) (citing ***Bush v. State***, 585 So. 2d 1262, 1264 (Miss. 1991)). This Court has discussed that burden, stating:

> It is true that this is an affirmative defense, and the burden of proof rests upon the defendant to prove it. When, however, he has introduced testimony to sustain this defense, he has met the burden of proof on this particular issue. The burden of proof, however, in a criminal case always rests upon the state to satisfy the jury by testimony beyond all reasonable doubt of the guilt of the accused. And they must be satisfied beyond all reasonable doubt that the affirmative defense is not true.

***Hosey v. State***, 136 Miss. 5, 100 So. 577, 578 (1924). Therefore, Spiers had to submit testimony to sustain the defense, and the burden remained with the State to prove guilt

36

beyond a reasonable doubt.[14] Spiers met his burden, as evidenced by the State's conceding that he was entitled to a consent to burglary jury instruction.

¶85.    A person who enters a building with the consent of its owner has not made an unlawful entry. ***Davis v. State***, 611 So. 2d 906, 911 (Miss. 1992) (quoting ***Mason v. State***, 344 So. 2d 144, 146 (Miss. 1977)). And "a properly worded [affirmative defense] jury instruction may [be] the difference between a guilty verdict and a not-guilty verdict." ***Brown***, 39 So. 3d at 900. The trial court improperly instructed the jury that Spiers had the burden to prove his defense of consent by clear and convincing evidence. The trial court's failure deprived Spiers of the opportunity to present his theory of defense.

¶86.    Accordingly, I would find that the trial court committed reversible error in its directive to submit a jury instruction containing the clear and convincing evidence standard and in failing to properly instruct the jury on the defense of consent.

## II.    Prosecutorial Misconduct

---

[14]*See* Miss. Jud. Coll., Mississippi Practice Series: *Model Jury Instructions* (Criminal) § 2:1 (2d ed.) Westlaw (database updated Oct. 2022) ("The defendant is not required to establish the truth of the alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the defendant was present and committed the crime, then you must give the defendant the benefit of any reasonable doubt and find the defendant not guilty.);*Id.* § 2:4 ("Evidence has been presented that the defendant acted under duress in committing the crime. . . . If the State has failed to prove from the evidence in this case beyond a reasonable doubt [and to the exclusion of every other reasonable hypothesis] that the defendant acted voluntarily in committing the crime and not under duress, then you shall find the defendant not guilty.").

¶87. Further, I respectfully disagree with the majority's conclusion that the prosecution's statements in closing argument were not highly inflammatory and prejudicial. This Court has stated that

> [t]he standard of review which this Court must apply to lawyer misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'

*Wilson v. State*, 194 So. 3d 855, 864 (Miss. 2016) (quoting *Galloway v. State*, 122 So. 3d 614, 643 (Miss. 2013)). Prosecutors "are not allowed to employ tactics which are 'inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.'" *Id.* (internal quotation marks omitted) (quoting *Galloway*, 122 So. 3d at 643).

¶88. The prosecution stated in closing argument that:

> We wonder why victims don't come forward. We say why won't they prosecute? Why won't they come forward? Why won't they speak out? If we hadn't been handed this week, yesterday and today, a clear example of why they do not. I think the evidence shows because not only do you have to fight to not be sexually battered in your own home when it happens, but you also have to fight against this at trial. To be accused of basically being a whore and sneaking in homeless men into your bedroom at night because you want to I guess sleep with them and not tell grandma and then make up this elaborate sociopath lie to make yourself look good. How does this make [MM] look good? How does any of this benefit her? We wonder why victims don't go forward because we second-guess everything they do.

I would find that the prosecution's comments were highly improper. As this Court has held, "[j]ustice is not served by attorneys who use closing argument to express inflammatory personal ideas or engage in personal vilification. The purpose of closing argument is to enlighten the jury, not to enrage it." *Bridgeforth v. State*, 498 So. 2d 796, 801 (Miss. 1986). A review of the transcript shows that defense counsel neither accused MM of "being a

whore" nor insinuated the like. He also did not accuse MM of "mak[ing] up [an] elaborate sociopath lie."

¶89.   Instead, defense counsel conducted an appropriate cross-examination. "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Ambrose v. State*, 254 So. 3d 77, 100 (Miss. 2018) (internal quotation mark omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). "[O]ne accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness." *Id.* at 102 (internal quotation marks omitted) (quoting *Suan v. State*, 511 So. 2d 144, 147-48 (Miss. 1987)). The prosecution's use of inflammatory language in its closing argument served to emotionally incite the jury and to place blame on the defendant for presenting a defense. Moreover, this error was compounded by the fact that the prosecution's case relied largely on MM's testimony, as she and Spiers were the only two people in the room when the alleged attempted sexual battery occurred. Accordingly, I would find that the prosecution's statements were highly inflammatory.

¶90.   Even so, counsel for Spiers did not raise an objection to the prosecution's comments. "[W]e repeatedly have provided that, though the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *Id.* at 130 (quoting *O'Connor v. State*, 120 So. 3d 390, 399 (Miss. 2013)). "Thus, we have held that 'in extreme cases, a failure to object to

[statements] which were violative of a constitutional right will not act as a procedural bar to consideration." *Id.* (quoting *Jackson v. State*, 174 So. 3d 232, 237 (Miss. 2015)). While I would find that the prosecution's comments were undoubtedly improper, I would not find that they amounted to the "most extreme and intolerable abuse of [the prosecutor's] privilege . . . ." *Jackson*, 174 So. 3d at 236 (internal quotation marks omitted) (quoting *Randall v. State*, 806 So. 2d 185, 221 (Miss. 2001)). Therefore, I agree with the majority's conclusion that this issue does not require reversal.

**KITCHENS, P.J., AND COLEMAN, J., JOIN THIS OPINION.**